637 F.2d 311
 AMERICAN LEASE PLANS, INC., a Foreign Corporation, Plaintiff-Appellee,
v.
SILVER SAND COMPANY OF LEESBURG, INC., a Florida
Corporation, Defendant and Third-Party Plaintiff-Appellant,
v.
Ronald D. and Janet M. ALLEN, etc., et al., Third-Party
Defendants-Appellees.
 No. 78-3136.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 17, 1981.
 
 Jeffry R. Jontz, Jerry R. Linscott, Orlando, Fla., for defendant and third-party plaintiff-appellant.
 Akerman, Senterfitt & Edison, J. Thomas Cardwell, Michael P. McMahon, Orlando, Fla., for plaintiff-appellee.
 John W. Rodgers, Orlando, Fla., for Ronald and Janet Allen.
 Appeal from the United States District Court for the Middle District of Florida.
 Before GODBOLD, TJOFLAT and SAM D. JOHNSON, Circuit Judges.
 TJOFLAT, Circuit Judge:
 
 
 1
 This case comes to us on appeal from a summary judgment for the plaintiff below, American Lease Plans, Inc. Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332 (1976); therefore, we must apply the relevant state law. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). It is clear that Florida law will apply in this case. Charles L. Bowman Co. v. Erwin, 468 F.2d 1293 (5th Cir. 1972); Boat Town U.S.A., Inc. v. Mercury Marine Div. of Brunswick Corp., 364 So.2d 15 (Fla.App.1978); Regal Shoe Shops v. Kleinman, 361 So.2d 765 (Fla.App.1978). See also Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Although we approach this case in a slightly different manner, on consideration of Florida law and the record before us, we affirm the decision of the district court.
 
 
 2
 * The facts of this case are not in dispute. Silver Sand Company of Leesburg, Inc. (Silver Sand) is a wholly owned subsidiary of United States Industries. Silver Sand's primary business activity is the sale and transportation of sand and other aggregates in central Florida. During the time relevant to this case, the chief operating officer and general manager of Silver Sand was Kenneth Surbaugh. Mr. Surbaugh served as both the Executive Vice-president and Secretary of Silver Sand.
 
 
 3
 As part of his duties as chief operating officer of Silver Sand, Surbaugh had occasion to evaluate Silver Sand's business procedures. As a result of this inquiry, Surbaugh recommended to his superiors in the United States Industries organization that Silver Sand reduce the capital it had currently invested in trucks by selling the majority of its trucks and contracting with independent lease operators for trucking services. Surbaugh's recommendation was accepted.
 
 
 4
 To implement this plan, the following scheme was devised: An independent truck lease operator would negotiate terms for acquiring a truck from a vendor, often times Silver Sand. A corporation engaged in the business of financing trucks and trailers (the "truck financier") would then purchase the truck on the agreed terms, thus merely stepping into the shoes of the lease operator in the purchase transaction. The truck financier would, in turn, enter into a leasing agreement with the lease operator. Payment under this lease was then guaranteed by Silver Sand. Finally, the lease operator would enter into a hauling contract with Silver Sand.
 
 
 5
 Silver Sand acted as guarantor in a series of these transactions. American Lease Plans, Inc., a corporation engaged in the business of truck financing, was one of several companies that leased trucks to operators pursuant to Silver Sand's plan. Several trucking companies that had leased trucks from American Lease Plans defaulted on their lease payments; American Lease Plans now seeks to hold Silver Sand liable as guarantor.
 
 
 6
 A recital of the relevant facts in further detail is important for a proper resolution of this appeal. It is uncontested that Surbaugh's superiors had placed him in control of the everyday business activities of Silver Sand. Other than regular monitoring, conducted by the President of Silver Sand, of Silver Sand's earnings and loss record, Surbaugh was free of managerial restraints. It is also uncontested that it was common knowledge in the business community that Surbaugh was the individual in charge at Silver Sand. Furthermore, Surbaugh's unfettered control of Silver Sand's business affairs was complemented by the trappings of corporate power: Surbaugh conducted business from a large executive office and was accorded the deference within the Silver Sand organization appropriate to one in a position of authority.
 
 
 7
 The particular facts of the transactions forming the basis of this action are also undisputed. Prior to execution of the lease guarantees, American Lease Plans sought to confirm Surbaugh's authority to bind Silver Sand. Pursuant to the company's standard operating procedure, American Lease Plans required a properly certified corporate resolution from Silver Sand evidencing Surbaugh's authority to execute the guarantees. On each occasion that Surbaugh, on behalf of Silver Sand, guaranteed leases with American Lease Plans, execution of the guarantees was preceded by presentation of Silver Sand corporate resolutions, certified by Surbaugh in his capacity as secretary, which authorized any officer of Silver Sand to execute guarantees with American Lease Plans. These resolutions recited that Silver Sand would be economically benefitted by the recommended business transaction. Although these resolutions appeared to be in proper form, Surbaugh had prepared and falsely certified them without the knowledge of any other Silver Sand officer.
 
 
 8
 American Lease Plans accepted these resolutions as authentic. Surbaugh then executed the guarantees with American Lease Plans, signing as Vice President of Silver Sand. He also signed the guarantees as Secretary of Silver Sand, although there is no indication that his signature in that capacity was required for proper execution of the guarantees. Surbaugh's execution of the guarantees was also accomplished without the knowledge of any other officer of Silver Sand. American Lease Plans accepted the guarantees as authentic.
 
 
 9
 It is further undisputed that an internal management guide of Silver Sand's parent, United States Industries, forbade an executive vice-president from executing guarantees without specific authorization, and that American Lease Plans was unaware of this United States Industries internal operating procedure.
 
 
 10
 After Silver Sand refused to comply with the terms of these guarantees, American Lease Plans filed suit in federal district court. Summary judgment on both liability and damages was eventually entered for American Lease Plans. The district court held that Surbaugh had acted as Silver Sand's agent in the guarantee transactions and that, because Surbaugh had been clothed with the apparent authority to enter these transactions, Silver Sand was liable as principal. Silver Sand appeals from this finding of liability.
 
 II
 
 11
 Silver Sand alleges three points of error: first, that summary judgment for American Lease Plans was improper because there were undecided material issues of fact concerning Surbaugh's apparent authority; second, that previous section 608.40 of the Florida General Corporation Act renders the relevant guarantees void and thus precludes summary judgment as a matter of law; and third, that summary judgment was improper because the district court incorrectly denied Silver Sand's motion for a continuance to allow for additional discovery.
 
 
 12
 We note at the outset that summary judgment is only proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). See also Shahid v. Gulf Power Co., 291 F.2d 422 (5th Cir. 1961). It follows that "when a movant makes out a convincing showing that genuine issues of facts are lacking, we require that the adversary adequately demonstrate by receivable facts that a real, not formal, controversy exists ...." Bruce Construction Corp. v. United States, 242 F.2d 873, 875 (5th Cir. 1957) (footnote omitted). We must address appellant's arguments with these standards in mind.
 
 A.
 
 13
 Appellant first contends that material issues of fact exist concerning Surbaugh's apparent authority. This contention is obscured by appellant's hermeneutics of the sometimes arcane law of agency authority. It is thus necessary to clarify the law that we must apply in this case.
 
 It has long been the law of Florida that:
 
 14
 Where a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform a particular act, and therefore deals with the agent, the principal is estopped, as against such third person, from denying the agent's authority.
 
 
 15
 T.G. Bush Grocery Co. v. Conely, 61 Fla. 131, 55 So. 867, 869 (1911). See also Doric Company v. Leo Jay Rosen Associates, Inc., 303 F.2d 817, 820 (5th Cir. 1962). In other words,
 
 
 16
 A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.
 
 
 17
 Restatement (Second) of Agency § 261 (1958). See Industrial Insurance Co. of New Jersey v. First National Bank of Miami, 57 So.2d 23 (Fla. 1952).
 
 
 18
 A third party dealing with the principal's agent must, as was stated in T.G. Bush, supra, be justified in relying on the authority in question; the third party must not have been confronted with circumstances adequate to put him on inquiry as to the legitimacy of the agent's authority. Industrial Insurance Co. of New Jersey v. First National Bank of Miami, 57 So.2d 23, 26 (Fla. 1952).
 
 
 19
 Applying this law to the undisputed facts before us, it is clear that Silver Sand had clothed Surbaugh with the appearance of authority to enter into these guarantee transactions on the company's behalf. Silver Sand had let the business world know that Surbaugh was the chief operating officer and manager of Silver Sand.
 
 
 20
 "The term 'manager,' applied to an officer or representative of a corporation, implies the idea that the management of the affairs of the company has been committed to his with respect to the property and business under his charge. Consequently his acts in and about the corporation's business, so committed to him, (are) within the scope of his authority.... The designation 'manager' implies general power, and permits a reasonable inference that he was invested with the general conduct and control of the defendant's business ... and his acts are, when committed in the line of his duty and in the scope of his employment, those of the company."Dade County Dairies, Inc. v. Projected Planning Company, 158 So.2d 565, 566-67 (Fla. D.Ct.App. 1963) (quoting S.H. Kress & Co. v. Powell, 132 Fla. 471, 180 So. 757, 760 (1938)). On the face of the events, Surbaugh had acted consistently with the appearance of authority he possessed by virtue of his agency relationship with Silver Sand. Silver Sand had created the appearance that Surbaugh had the authority to conduct Silver Sand's business affairs, and Surbaugh's activities surely appeared reasonable and in furtherance of the business interests of his principal, especially in light of the undisputed fact that Silver Sand had entered into similar guarantees with other finance companies. Furthermore, by allowing Surbaugh to hold the office of corporate secretary, Silver Sand had clothed Surbaugh with the authority to certify resolutions of the corporation. See W.M. Fletcher, 2 Cyclopedia of The Law of Private Corporations § 651 (Rev. Ed. 1969). Thus, Surbaugh's certification of corporate resolutions was undoubtedly an action within the scope of authority conferred on him by Silver Sand.
 
 
 21
 Public policy dictates that such reasonable undertakings by an agent clothed with the authority so to act be sufficient to bind a principal. See Hudak v. Economic Research Analysts, Inc., 499 F.2d 996, 1002 (5th Cir. 1974), cert. denied, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 821 (1975) (citing One Hour Valet of America v. Keck, 157 So.2d 83 (Fla. D.Ct.App. 1963)); Aetna Insurance Co. v. Holmes, 59 Fla. 116, 52 So. 801, 802 (1910). It is of no avail to argue that Surbaugh did not have the authority to certify falsely, or to guarantee fraudulently; most assuredly he did not. But, given the position Silver Sand placed him in, and the authority the company clothed him with, it is equally of no avail to argue under the law of Florida for an absence of agency-based liability on the part of Silver Sand. The issue, rather, is whether any circumstances were present which should have undermined American Lease Plans's otherwise reasonable reliance on the appearance of Surbaugh's authority. Put another way, the issue is whether there are facts in the record adequate to create a triable question concerning the reasonableness of American Lease Plans's failure to seek further authority for Surbaugh's exercise of power.
 
 
 22
 After extensive discovery, Silver Sand presents six facts which allegedly create a triable issue of whether American Lease Plans had reason to suspect that something was amiss in regard to Surbaugh's authority.
 
 
 23
 To defeat a (summary judgment) movant who has otherwise sustained his burden within the principles enunciated (in Rule 56), the party opposing the motion must present facts in proper form conclusions of law will not suffice. And the opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicious.
 
 
 24
 6 Moore's Fed. Practice P 56.15(3) at 56-485 56-487 (1976) (footnotes omitted). We must evaluate Silver Sand's arguments against this standard.
 
 
 25
 First, Silver Sand asserts that American Lease Plans had received a document, entitled Consent of Stockholder In Lieu of Meeting of Stockholders, prior to execution of the guarantees. That document evidenced the election of the officers of Silver Sand, including the election of Surbaugh as Vice President and Secretary. Silver Sand argues that, because a corporation's officers are traditionally elected by the board of directors, the document should have put American Lease Plans on notice that Silver Sand did not have a board of directors. This, in turn, should have aroused suspicion concerning the corporate resolutions certified by Surbaugh which each contained a recital concerning a meeting of Silver Sand's board of directors.
 
 
 26
 This contention is not persuasive. American Lease Plans obtained the Consent of Stockholder document as part of the company's attempt to confirm Surbaugh's authority to execute guarantees on behalf of Silver Sand. Record, vol. II at 269. The document is not inconsistent with Silver Sand having a board of directors. Indeed, if anything, the document lends support to American Lease Plans's reliance on Surbaugh's authority, for the document further evidences Surbaugh's position of power within Silver Sand.
 
 
 27
 Next, Silver Sand argues that an internal American Lease Plans memorandum which reflects Surbaugh's wish that all communications regarding the lease guarantees occur directly with him is indicative of questionable business conduct, and thus should have undermined American Lease Plans's reliance on Surbaugh. It is uncontested that Surbaugh was the man in charge of Silver Sand's daily business undertakings. Given the common knowledge of this fact, Surbaugh's wish to maintain exclusive control of the guarantee transactions cannot be said to arouse doubt; rather, it appears quite consistent with the appearance of authority Surbaugh had within the business community.
 
 
 28
 For the same reason, Silver Sand's contention that American Lease Plans's decision to deal exclusively with Surbaugh indicates misplaced reliance must also be rejected. Given the uncontested fact of Surbaugh's appearance of authority, generated by Silver Sand's holding him out as chief operating officer of Silver Sand, American Lease Plans's decision to deal with the man in charge of Silver Sand seems quite reasonable.
 
 
 29
 Silver Sand further argues that American Lease Plans's acceptance of a Silver Sand guarantee, executed by Surbaugh, of a lease of a car to Surbaugh is indicative of American Lease Plans's inadequate business procedures. American Lease Plans accepted this guarantee after acceptance of several of the lease guarantees which form the basis of this action. Nothing in the record indicates that provision of a car to an executive by his company is so unusual as to arouse suspicion. In any event, if suspicion was aroused, it would have properly been focused on the legitimacy of the private car lease guarantee, and not upon the commercial guarantees.
 
 
 30
 The almost contemporaneous execution of the corporate resolutions and the lease guarantees, as well as of the occurrence of the alleged Silver Sand board of directors meetings is, according to Silver Sand, a decidedly suspicious circumstance. We find no merit in this contention; nothing in the record indicates the improbability of such events.
 
 
 31
 Finally, Silver Sand argues that the lease guarantees in question were so unusual in the relevant business community that American Lease Plans was unreasonable in not seeking further confirmation of Surbaugh's authority. On the contrary, it is undisputed that Silver Sand's general plan of truck financing had received the imprimatur of Silver Sand's parent, United States Industries, and that the business community knew Silver Sand had entered into similar lease guarantees with other truck financing companies. While it may have been unusual for American Lease Plans, all indications were that the guarantees were consistent with Silver Sand's recent business activity and with the relevant business community's justifiable perception of Silver Sand's commercial direction.
 
 
 32
 Thus, Silver Sand has not directed us to anything in the record giving rise to a triable question of the reasonableness of American Lease Plans's reliance on the appearance of Surbaugh's authority.
 
 B.
 
 33
 Silver Sand's second point of error concerns former section 608.40 of the Florida statutes. This statute, repealed in 1976 but arguably applicable to this cause of action, reads:
 
 
 34
 Officers; Selection, Terms, etc. Every corporation shall have a president, who shall be a director, a secretary and a treasurer. They shall be chosen by the directors and shall serve until their successors are chosen and qualify. All other officers, agents and factors shall be chosen, serve for such terms and have such duties as may be prescribed by the certificates of incorporation or the bylaws or determined by the board of directors. Any person may hold two or more offices, except that the president may not also be the secretary or assistant secretary. No person holding two or more offices shall sign any instrument in the capacity of more than one office.
 
 
 35
 Fla.Stat. § 608.40 (repealed 1976) (emphasis added). Silver Sand's argument is that this statute necessarily voids the lease guarantees executed by Surbaugh on behalf of Silver Sand because those guarantees were signed by Surbaugh, as Vice President of Silver Sand, and also attested by Surbaugh in his capacity as Silver Sand's Secretary. As the district court pointed out below, Record, vol. IV at 739, this issue poses a difficult question. Florida law does not give us assistance in resolving this problem. Nevertheless, we feel that the briefs of the parties have shed sufficient light on the question to make our brief foray into Florida statutory construction appropriate.
 
 
 36
 Silver Sand does not argue that Florida law requires lease guarantees to be signed by more than one corporate officer. Furthermore, Silver Sand has not offered any indication that its by-laws or articles of incorporation require guarantees to be executed by more than one officer. It is also undisputed that the form guarantees in question were merely a matter of American Lease Plans's internal operating procedure.
 
 
 37
 Thus, the question is whether section 608.40 was meant to apply to corporate instruments that, as a matter of law, did not require for validity the signatures of two corporate officers. Would the statute apply, in other words, to an instrument on which a second officer's signature was mere surplusage?
 
 
 38
 We cannot endorse an interpretation of 608.40, in the absence of Florida authority so requiring, which makes the statute applicable in regard to a corporate instrument requiring only one signature for validity. Such an interpretation is facially illogical the statute would seem to have been geared toward prohibiting a corporate officer's signature of a document in a dual capacity when the authorization of two officers was required. See Fla.Stat. § 607.224(1) (1976) (articles of merger or consolidation require signatures of two corporate officers) (note that 608.40 and the predecessor to 607.224 were concurrently in effect for a period of time.) To impose the requirement in a situation in which only one signature is necessary seems an unduly strained application of legal reasoning. We therefore must concur in the district court's finding that section 608.40 is inapplicable to the facts before us.
 
 C.
 
 39
 Silver Sand's final point of error is based on the district court's denial of the company's motion for a continuance under Fed.R.Civ.P. 56(f). Approximately six months after entry of summary judgment against Silver Sand on liability, see Brief for Appellee at 32, Silver Sand discovered what it felt was evidence justifying a continuance of the hearing on American Lease Plans's summary judgment motion concerning damages.
 
 
 40
 Viewing the facts in the light most favorable to Silver Sand, the company had discovered that the President of several Florida trucking companies, all potential beneficiaries of Silver Sand's truck leasing plan, had made donations of money on behalf of a legislative lobbying effort in regard to a proposed state law concerning dump truckers. These payments were made at the urging of Mr. Surbaugh. See Deposition of Robert Uttal at 9-10. Silver Sand asserts that these payments somehow constituted "kickbacks" to Surbaugh and thus must serve as "hard evidence," Brief for Appellant at 19, that illegal payments occurred between trucking companies benefitting from Silver Sand's lease guarantees and Surbaugh. The company sought to continue the proceedings in the instant case in the hope of using this evidence to establish a link between the allegedly illegal payments and American Lease Plans's true understanding concerning Surbaugh's authority. The district court denied this motion.
 
 
 41
 When a party moves the court under Fed.R.Civ.P. 56(f) for a continuance to allow additional discovery, "he directly and forthrightly invokes the trial court's discretion." 6 Moore's Fed. Practice P 56.24 at 56-1425 (1980). It naturally follows, therefore, that "absent abuse of discretion, the trial court's determination will not be interferred with by the appellate court." Id. at 56-1428. See Southern Rambler Sales, Inc. v. American Motors Corp., 375 F.2d 932, 937-38 (5th Cir.), cert. denied, 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967).
 
 
 42
 Silver Sand has proffered no reasons why the discovery the company now deems essential was not conducted earlier during the long course of this lawsuit; the company does not argue that this information was in any way inaccessible. Neither does Silver Sand demonstrate more than a tenuous, potential connection between allegedly illegal payments to Surbaugh and the reasonableness of American Lease Plans's reliance on the appearance of Surbaugh's authority. See Brief for Appellant at 20. The deposition testimony does not justify the inference of a kickback, and certainly does not provide the basis for an inference that American Lease Plans had knowledge of matters which might have given rise to doubts concerning Surbaugh's authority.
 
 
 43
 It is evident to us that sufficient time had elapsed during the course of this lawsuit to allow Silver Sand to pursue the discovery the company now finds important, especially in light of the company's contention throughout this lawsuit that Surbaugh had been acting improperly. See Record, vol. I, at 85 (Answer of defendant Silver Sand). We cannot justify further protraction of this lawsuit on the basis of mere conjecture; therefore, we must uphold the district court's denial of the continuance as a proper exercise of discretion. First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 298-99, 88 S.Ct. 1575, 1597, 20 L.Ed.2d 569 (1968).
 
 
 44
 AFFIRMED.