Victor **CHAMBERS**, Plaintiff,

v.

**WALT DISNEY WORLD CO.**, Defendant.

No. 6:99–CV–1218ORL18DAB.

United States District Court,
M.D. Florida,
Orlando Division.

March 6, 2001.

Victor Chambers, Orlando, FL, Pro se.

Charles Robinson Fawsett, Patrick M. Muldowney, Shutts & Bowen LLP, Orlando, FL, for Walt Disney World Company, defendants.

## ORDER

G. KENDALL SHARP, Senior District Judge.

THIS CAUSE comes before the Court upon Defendant Walt Disney World's motion for summary judgment (Doc. 30), to which Plaintiff Victor Chambers has responded in opposition (Doc. 39). Because no genuine issue of material fact exists as to whether Defendant intentionally discriminated against Plaintiff, Defendant's motion is **GRANTED.**

## I. BACKGROUND

Plaintiff's distinguished criminal career includes twenty-five (25) arrests and seven convictions. (Doc. 33, Exhibit 4.) Specifically, Plaintiff's record reveals convictions for larceny (1970), impersonating an officer (1975), burglary of a residence by forced entry (1976), making a false report (1978), loitering and prowling (1980), burglary

(1980), and shoplifting (1988). (*Id.*, Arrests Nos. 1, 9, 14, 16, 19, 20, & 24.)[1]

In June 1990 and July 1991, Plaintiff submitted to Defendant employment applications for culinary positions. (Doc. 37, Exhibits 1 & 2.) Both applications asked, *inter alia*, whether Plaintiff had "*ever* been convicted of any crime other than a minor traffic violation." (*Id.* at 2) (emphasis added). Twice Plaintiff answered "No." (*Id.*) By signing his applications, Plaintiff certified his answers to be true and acknowledged "that falsification or misrepresentation of this or any other personnel record may result in [Plaintiff's] discharge." (*Id.*)

In July 1991, Defendant hired Plaintiff to work as a "prep chef." (Doc. 37 at 24.) Eventually Defendant accepted Plaintiff into its one-year management training program. (*Id.* at 26–7.) Plaintiff completed the program and applied for an open management position at Defendant's All Star Resort. (*Id.* at 28.)

All Star Chef Ken Hittman interviewed Plaintiff and, in March 1997, promoted him to "Restaurant Chef," a manager level position in the Food and Beverage Department. (*Id.* at 29–30.) The All Star Resort is composed of two sub-resorts, "Music" and "Sports." (*Id.*) Plaintiff was assigned to Sports, but, like all managers, worked interchangeably at either resort as needed. (*Id.*)

Hittman and Ken Bates, both white males, supervised Plaintiff. (*Id.* at 32.) In turn, Hittman and Bates reported to the Resort General Manager, Norm Noble, an African American male. (*Id.* at 33; Doc. 33 at 4.)

On 30 March 1998, Plaintiff filed a written complaint of discrimination with Defendant's Employee Relations Department. (*Id.*, Exhibit 6.) Plaintiff informed Defendant that: 1) in May 1997, another manager, John Day, told Plaintiff he would not be accepted as part of the management

---

1. Plaintiff takes no exception to the contents of the criminal history report submitted by Defendant. Indeed, Plaintiff confirmed much of his record in his deposition and written termination statement. (Doc. 37 at 122–29; Exhibit 8.)

team unless Plaintiff enrolled in specific courses;[2] 2) from July to December 1997, another manager, Vinny Schudde, locked Plaintiff out of the manager's office and repeatedly refused to take Plaintiff's telephone calls, electing instead to pick up and slam down the telephone; 3) on 14 March 1998, in response to a page, Plaintiff called the identified telephone number and "listened to comments made by a hate group;"[3] and 4) on 24 March 1998, Bates transferred Plaintiff from Sports to Music. (*Id.*)

One week later, Plaintiff filed a second written complaint informing Defendant that: 1) in April 1997, Bates orally disciplined Plaintiff for disrupting the kitchen by publicly discussing promotion possibilities with a subordinate employee, Fred Rutherford, an African American male;[4] 2) in February 1998, a dispute arose between Plaintiff and two other managers regarding Plaintiff's method of completing "preference sheets," which Plaintiff ultimately won; 3) in January 1998, Bates directed Plaintiff to apologize to a front desk manager for improperly handling a guest dispute; 4) in April 1998, another manager, Marie Sarich, complained about Plaintiff's reorganization of the dishroom and told Plaintiff not to do "things without

permission from the team;" 5) Bates promoted three employees to "full supervisor" without posting the openings as required by company policy; and 6) on 5 April 1998, "Art" said Plaintiff's treatment was due to the fact that Plaintiff had not "earned their respect." Plaintiff responded that "respect given is respect due, and the only thing I earn is a living." (*Id.*, Exhibit 7.)

Employee Relations and Noble launched an extensive investigation into Plaintiff's complaint which included interviews with fourteen (14) employees. (Doc. 33 at 2.) From April to July 1998, Plaintiff had multiple meetings with Noble and Employee Relations. (*Id.;* Doc. 37 at 115.) Each time Noble asked how Plaintiff was being treated and requested information on new developments. (Doc. 37 at 116–17.)

After Plaintiff filed his complaints, Sarich began referring to Plaintiff as an "uncivilized wild man," and "Chief Wild Man Victor." (*Id.* at 39–40.) When Plaintiff asked Sarich, "Why do you keep calling me wild man?," Sarich replied, "You know how all of you are." (*Id.* at 40.) Later, in May or July 1998, Sarich confessed to Plaintiff her "problem getting along with people of color." (*Id.* at 41–2.)[5]

2. At his deposition almost two years later, Plaintiff remembered that Day requested Plaintiff to take additional courses because, "as a black, [Plaintiff] don't know as much." (Doc. 37 at 49–50, 61–2.) Plaintiff refused and said that Day and the other managers were his equals, not supervisors. (*Id.* at 62.) In response, Day requested Plaintiff to leave the department. (*Id.*)

3. Plaintiff informed Bates about the page, Bates immediately replaced Plaintiff's pager, and the pages stopped. (Doc. 37 at 80–2.)

4. During his deposition, when asked whether Bates "mention[ed] race at all" during this conversation, Plaintiff explained that "[p]eople have ways of mentioning things without just right out, coming right out and saying it, where you just get the point what they're talking about ... You know, you don't have to come out and just spit it right out. You can throw a hint. People know where your coming from. They catch the drift." (Doc. 37 at 89.)

When asked how he caught such a drift, Plaintiff remembered that Bates actually said, "Don't be going around telling Fred or any other blacks that they can be putting in for no promotion." (*Id.* at 89–90.) Notably, Plaintiff failed to include Bates' alleged comment in his written statement to Employee Relations, (Doc. 37, Exhibit 7), sworn interrogatory answers, (Doc. 31), and Charge of Discrimination. (*Id.*, Exhibit 15.) In fact, Plaintiff never informed Defendant about Bates' alleged comment. (Doc. 37 at 90.)

5. Plaintiff alleges that Sarich's confession was made between May and July of 1998, but "definitely" not in April 1998. (*Id.* at 42.) Plaintiff claims to have informed Bates and Hittman of Sarich's alleged comment during a meeting when Plaintiff "first filed the complaint." (*Id.*) Interestingly, Plaintiff first filed his complaint in March 1998, two months before Sarich's alleged confession. (*Id.*, Exhibit 6.)

Additionally, another manager, Marie Cissle, posted a notice requesting subordinate employees to "please call the vice president in support of the managers about the complaint[.]" (*Id.* at 132.) Plaintiff informed Noble and Noble "called the morning manager and asked them which one put it up." (*Id.* at 133–34.) Cissle confessed and Noble removed the sign. (*Id.* at 134.)

In May or June 1998, subordinate employees organized a petition to have Plaintiff "removed from the All Star Resort because the managers there are good managers and [Plaintiff was] the one who should be leaving." (*Id.*) Further, subordinate employees planned (but failed) to stage a strike in opposition to Plaintiff's complaint, (*Id.* at 140–41), and Plaintiff arrived at work one morning to find several employees "all in tears, crying, complaining about [Plaintiff] filing a complaint on the managers." (*Id.* at 137.)

On 18 June 1998, Plaintiff met with Noble, Vice President Bill Ernest, and three representatives from Employee Relations, including the Director of Employee Relations, Steve Eisenhardt. (*Id.*) After Noble asked how Plaintiff was being treated, Eisenhardt allegedly stated that Plaintiff was "under investigation" for "filing too many complaints." (*Id.* at 117–19.)

During the investigation of Plaintiff's discrimination complaints, Noble "became aware that a non-supervisory employee who worked at the All Star Resort, Nancy Apple . . . had come forward with information that [Plaintiff] had a criminal record prior to his employment by [Defendant]." (Doc. 33 at 2.) Apple investigated Plaintiff on her own initiative "because she was concerned based on her own observations of [Plaintiff's] behavior toward young guests and co-workers that she felt was inappropriate." (*Id.* at 3; Exhibit 3.)

Since 1997, Defendant has maintained a practice of having "a formal criminal background check performed on an employee where information is received about past criminal conduct or a past criminal record which may cast reasonable doubt on the fitness of that employee to work at [Defendant]." (Doc. 35 at 1.) "That practice was followed in the usual manner in the case of [Plaintiff] based on information furnished about him by a co-worker, Nancy Apple." (*Id.* at 2)

Defendant's background check revealed Plaintiff's numerous arrests and criminal convictions. (Doc. 33 at 3.) After reviewing Plaintiff's record, Noble inspected Plaintiff's employment applications and discovered that Plaintiff had falsified his applications. (*Id.*) Noble confronted Plaintiff and Plaintiff "admitted that he had at least one criminal conviction prior to filling out his applications." (*Id.*)

Defendant maintains an "established policy calling for termination of employment for false statements on employment applications." (*Id.;* Exhibit 7, "*Employment Policy Manual.*") Pursuant to that policy, Noble concluded that Plaintiff should be terminated. (*Id.* at 4.) Noble "alone was responsible for making the final decision to terminate [Plaintiff]." (*Id.*) According to Noble, Plaintiff's "termination had nothing to do with his complaints of race discrimination, nor did they have anything to do with his race." (*Id.*)

On 20 July 1998, Noble terminated Plaintiff for falsifying his employment application. (Doc. 37 at 120–21.) Upon request, Plaintiff wrote a statement confirming parts of his criminal record and explaining that he assumed the application question was limited to convictions within the last five years. (*Id.,* Exhibit 8.)

Ultimately Defendant's investigation into Plaintiff's discrimination complaints "resulted in written reprimands and/or counseling being issued to a number of employees for inappropriate conduct, as well as the transfer of some of [Plaintiff's] co-workers to other facilities." (Doc. 33 at 2.) Disciplined employees included, among others, Bates, Schudde, Sarich, and Day. (*Id.,* Exhibit 2.)

On 4 August 1998, Plaintiff filed a Charge of Discrimination with the Orlando Human Relations Department. (*Id.,* Exhibit 15.) After receiving a right to sue letter, Plaintiff filed this action under Title VII and § 1981 alleging claims for race discrimination and retaliation.

## II. LAW

### A. Summary Judgment

Federal summary judgment procedure pierces the pleadings to assess the proof to determine whether there is a genuine need for trial. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is authorized if the record evidence reveals no genuine issue as to any material fact.[6] *See* Fed.R.Civ.P. 56(c). "Genuine" issues reasonably may be resolved in favor of either party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Material" issues affect the outcome of the suit under controlling law. *Id.* at 248, 106 S.Ct. 2505.

The movant bears the initial burden to show that no genuine issue of material fact remains for trial. *See Celotex v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.") If the movant succeeds, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. To avoid summary judgment, the opposing party must come forward with specific facts that are "material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicious." *American Lease*

Plans, Inc. v. Silver Sand Co. of Leesburg, Inc.,* 637 F.2d 311, 315 (5th Cir.1981). Conclusory allegations do not suffice, *Johnson v. Fleet Finance, Inc.,* 4 F.3d 946, 949 (11th Cir.1993), and if "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

At the summary judgment stage, the Court "must review the evidence and all *reasonable factual inferences* arising from it in the light most favorable to the non-moving party." *Id.* (emphasis added). "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1324 (11th Cir.1983). Indeed, "[s]peculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Tyler v. Runyon,* 70 F.3d 458, 469 (7th Cir.1995).

### B. Title VII

■ Title VII makes it unlawful for employers to intentionally discriminate based upon protected traits including race, color, religion, sex and national origin. 42 U.S.C. § 2000e–2(a)(1). Intentional discrimination may be proved via direct, circumstantial, or statistical evidence. *See Standard v. ABEL Serv., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998). No matter the form of proof, however, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

#### 1. Direct Evidence

■ Direct evidence of intentional discrimination is evidence which, if believed,

---

6. Record evidence includes pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* Fed.R.Civ.P. 56(c). *See Pritchard v. Southern Co. Serv.,* 92 F.3d 1130, 1135 (11th Cir.1996) (non-movant

"cannot use inadmissable hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial."), citing *McMillian v. Johnson,* 88 F.3d 1573 (11th Cir.1996).

"establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard,* 161 F.3d at 1330, *quoting Carter v. City of Miami,* 870 F.2d 578, 581–82 (11th Cir.1989). "Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir.1997) (internal marks and citations omitted).

The Eleventh Circuit has "marked severe limits for the kind of language to be treated as direct evidence of discrimination." *Jones v. Bessemer Carraway Med. Ctr.,* 151 F.3d 1321, 1323 n. 11 (11th Cir. 1998), *superseding in part* 137 F.3d 1306 (11th Cir.1998). To amount to direct evidence, a statement must: (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus.

### a. Decisionmaker

First and foremost, "the evidence must indicate that the complained-of employment decision was motivated by the decisionmaker's [animus]." *Damon v. Fleming Supermarkets, Inc.,* 196 F.3d 1354, 1358–59 (11th Cir.1999). "[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Standard,* 161 F.3d at 1330 (citation omitted); *see also Evans v. McClain of Georgia,* 131 F.3d 957, 962 (11th Cir.1997).

A "decisionmaker" is broadly defined as "a person involved in the challenged decision." *Trotter v. Bd. of Trustees,* 91 F.3d 1449, 1453–54 (11th Cir.1996). However, the mere fact that a management employee reviewed and evaluated the challenged decision and supplied information (favorable or unfavorable) to the final decisionmaker does not elevate that employee to decisionmaker status absent evidence that the employee had authority to overrule the final decision. *See Clover v. Total System Services, Inc.,* 176 F.3d 1346, 1356 (11th Cir.1999). At a minimum, to be deemed a decisionmaker, evidence must show that the employee made a recommendation concerning the challenged employment action, such as members of a hiring committee or promotion panel. *Id.; see also Bass v. Bd. of Commissioners,* 242 F.3d 996, 1005 (11th Cir.2001) ("Only statements by the persons involved in the decisionmaking process, here the interview panel members, could constitute direct evidence of discrimination.")

### b. Challenged Employment Decision

Second, the decisionmaker's statement must specifically relate to the challenged employment decision.[7] Illustrations are many, but one, specially apposite, may be selected from the mass. In *Burrell v. Board of Trustees of Georgia Military College,* 125 F.3d 1390 (11th Cir.1997), the female plaintiff sued her former employer for gender discrimination and retaliatory discharge. 125 F.3d at 1391. One year before the decisionmaker terminated plaintiff, plaintiff requested the decisionmaker to promote her from senior vice president to executive vice president. *Id.* at 1393. The decisionmaker responded "that he wanted to hire a man for the position because too many women filled [defendant's] officer positions." *Id.*

The Eleventh Circuit ruled that the decisionmaker's comment was not direct evidence of discrimination because it did not specifically address (nor was it made in the context of) plaintiff retaining her job with defendant. *Id.* at 1393 n. 7. By definition, the comment was circumstantial evidence because the jury must infer that the decisionmaker's unwillingness to promote a female to executive vice president "meant

---

7. In the usual case, this requirement also ensures temporal proximity to the adverse decision. *See Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286, (11th Cir.1998) (excessive temporal proximity between decisionmaker's statement and adverse action precludes consideration of statement as direct evidence); *Damon,* 196 F.3d at 1362.

that he also intended to later terminate female employees because they were female." *Id.* Hence, when a decisionmaker "makes a specific comment in relation to a specific job or promotion ... the value of that comment as direct evidence is limited to a challenge to that specific job or employment decision." *Id.*

*See also Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1082 (11th Cir.1990) (documents detailing employees' ages and assessing number of employees eligible for voluntary early retirement were *not* direct evidence of age discrimination because "[n]one of the documents relate to specific actions taken towards plaintiffs because of plaintiffs' age.")

#### c. Blatancy

■ Third, direct evidence includes "only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [a protected trait]." *Carter,* 870 F.2d at 581–82. "Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." *Taylor v. Runyon,* 175 F.3d 861, 867 (11th Cir.1999) (citation omitted). Nor does evidence of facially neutral remarks from which plaintiff infers discriminatory intent. *See Carter,* 870 F.2d at 582. An example of the requisite blatancy, in the age discrimination context, is a management memorandum saying, "Fire Early—he is too old." *Earley,* 907 F.2d at 1081.

#### 2. *Circumstantial Evidence*

Absent direct evidence, plaintiff may prove intentional discrimination with circumstantial evidence under the framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

#### a. Prima Facie Case

■ Plaintiff bears the initial burden of establishing a prima facie case of discrimination, the elements of which vary by type of claim presented. *Id.* at 802 & n.

13, 93 S.Ct. 1817. "Demonstrating a prima facie case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997). In this pursuit, however, plaintiff "cannot rely on attenuated possibilities that a jury would infer a discriminatory motive, but rather must come forward with sufficient evidence to establish a prima facie case[.]" *Pace v. Southern Railway System,* 701 F.2d 1383, 1391 (11th Cir.1983). Personal opinions and conclusory allegations, in the absence of supporting evidence, are insufficient to withstand summary judgment. *Holifield,* 115 F.3d at 1564 & n. 6; *Earley,* 907 F.2d at 1083.

■ Establishment of a prima facie case creates a rebuttable presumption that the employer engaged in intentional discrimination. *See Burdine,* 450 U.S. at 254 & n. 7, 101 S.Ct. 1089.

#### b. Legitimate, Nondiscriminatory Reason

■ Next, "[i]f a plaintiff establishes a prima facie case of discrimination, the defendant employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir.2000) (en banc). Defendant's proffered reason must be clear, reasonably specific, and supported by admissible evidence, but Defendant need not show it was actually motivated by the proffered reason. *See Burdine,* 450 U.S. at 254–55, 258, 101 S.Ct. 1089. Instead, defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* at 257, 101 S.Ct. 1089.

#### c. Pretext[8]

■ Finally, "[i]f defendant articulates one or more such reasons, the presumption

8. "Pretext" means "a false or weak reason or

motive advanced to hide the actual or strong

of discrimination is eliminated and the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Chapman,* 229 F.3d at 1024 (internal quotations and citation omitted).

To survive summary judgment, plaintiff must "present concrete evidence in the form of specific facts which show that the defendant's proffered reason is a mere pretext. Mere conclusory allegations and assertions will not suffice." *Earley,* 907 F.2d at 1081. Should plaintiff fail to adduce "sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment." *Chapman,* 229 F.3d at 1024–25; *see also Damon,* 196 F.3d at 1360 (plaintiff must offer "enough probative evidence so that a reasonable jury might" find pretext).

 A decisionmaker's statement not amounting to direct evidence of discrimination may constitute "probative circumstantial evidence" of discrimination depending upon the statement's "substance, context, and timing." [9] *Damon,* 196 F.3d at 1359, 1361–62; *see also Jones,* 151 F.3d at 1322 n. 11; *Ross,* 146 F.3d at 1291 (decisionmaker's discriminatory comment uttered "sometime in 1990" was circumstantial evidence of pretext regarding plaintiff's termination in January 1994.) However, "[t]he biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case." *Holifield,* 115 F.3d at 1563–64 (citations omitted); *see also Trotter,* 91 F.3d at 1457 (same); *Gupta,* 212 F.3d at 589 n. 20

(same); *Standard,* 161 F.3d at 1329–30 (same).

 Plaintiff may not establish pretext "merely by questioning the wisdom of the employer's reason, at least not where ... the reason is one that might motivate a reasonable employer." *Combs,* 106 F.3d at 1543. As the Eleventh Circuit has made clear:

> Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. Title VII addresses discrimination. Title VII is not a shield against harsh treatment at the workplace. Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.

*Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984) (internal marks and citations omitted). Simply put, "[t]he heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the [challenged action], but whether the employer really was motivated by those reasons." *Standard,* 161 F.3d at 1333.

Even if the plaintiff adduces sufficient evidence of pretext, however, the plaintiff still may not survive summary judgment. As clarified by the Supreme Court:

> [A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's

---

reason or motive." *Black's Law Dictionary* 1206 (7th ed.1999).

**9.** Inconsistencies between a decisionmaker's deposition testimony and affidavit "may be evidence of pretext." *Damon,* 196 F.3d at 1365.

finding of liability. *Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.* For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000) (emphasis added).[10] *See Chapman,* 229 F.3d at 1025 n. 11 (recognizing modification of *Combs,* 106 F.3d at 1538.)

### III. APPLICATION [11]

### A. Disparate Treatment

#### 1. Direct Evidence

■ Undisputed evidence establishes that Noble alone made the final decision to terminate Plaintiff. Plaintiff offers no evidence that Noble made any statements concerning Plaintiff's termination that reveal blatant race discrimination.

Nevertheless, Plaintiff contends that the record contains two statements constituting direct evidence of discrimination. Specifically, Plaintiff points to Bates' alleged statement in April 1997 ("Don't be going around telling Fred or any other blacks that they can be putting in for no promotion"), and Day's alleged statement in May 1997 ("as a black person, you don't know as much.") Neither statement amounts to direct evidence, however, because neither Bates nor Day were involved in the decision to terminate Plaintiff, and neither statement correlates to Plaintiff's termination in July 1998.

#### 2. Circumstantial Evidence

■ There being no direct evidence, Plaintiff must adduce sufficient evidence to create a presumption of intentional discrimination under *McDonnell Douglas.* To establish a prima facie case of race discrimination, Plaintiff must show: "1) he belongs to a racial minority; 2) he was subjected to an adverse job action; 3) his employer treated similarly situated employees outside his classification more favorably; and 4) he was qualified to do the job." *Holifield,* 115 F.3d at 1562, *citing McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

Plaintiff cannot establish a prima facie case of disparate treatment because Plaintiff offers no evidence showing that Defendant treated a *similarly situated* employee outside Plaintiff's classification more favorably. "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Id.* Because Plaintiff fails to point to a specific, non-African American employee who falsified his employment application (by failing to disclose criminal convictions) but was not terminated, Defendant's motion for summary judgment on Plaintiff's disparate treatment claim must be **GRANTED**.[12]

---

**10.** Although *Reeves* involved a judgment as a matter of law under Fed.R.Civ.P. 50, the "standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." *Id.* at 2110, 120 S.Ct. 2097 (quotations and citations omitted).

**11.** Because Title VII and § 1981 claims are evaluated using the same analytical framework, the Court shall explicitly address Plaintiff's Title VII claims with the understanding that the Court's analysis applies to Plaintiff's § 1981 claims as well. *See Standard,* 161 F.3d at 1330.

**12.** Even if Plaintiff established a prima facie case, summary judgment is warranted because the Court's pretext analysis in section

## B. Retaliation

Title VII makes it unlawful for an employer to discriminate against an employee because the employee has opposed any practice made an unlawful employment practice under Title VII, or because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000e–3(a).

### 1. Direct Evidence

■ Plaintiff's evidence in support of his retaliation claim is limited to Eisenhardt's alleged statement in June 1998 that Plaintiff was under investigation for filing too many complaints. (Doc. 37 at 131–32.) Although Noble, in reaching his decision to terminate Plaintiff, conferred with Employee Relations, of which Eisenhardt is the Director, Plaintiff offers no evidence showing either that Eisenhardt had the authority to overrule Noble's final decision, or that he made a recommendation concerning whether Noble should terminate Plaintiff. (Doc. 37 at 147.) *See Clover,* 176 F.3d at 1355 (jury may not speculate as to contents of communications between corporate executives). Because Eisenhardt cannot be considered a decisionmaker as to Plaintiff's termination, his alleged comment is not direct evidence of discrimination.

### 2. Circumstantial Evidence

■ There being no direct evidence of retaliation, Plaintiff must create a presumption of intentional discrimination under *McDonnell Douglas.* To establish a prima facie case of retaliation, Plaintiff must show that: (1) he participated in an

activity protected by Title VII; (2) he suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. *See Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 587 (11th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 772, 148 L.Ed.2d 671 (2001).

■ It is undisputed that Plaintiff engaged in a protected activity under Title VII's opposition clause and thereafter suffered an adverse employment action (termination).[13] At issue, however, is whether Plaintiff has established the requisite causation.

■ To establish a causal connection, Plaintiff must show that Noble was aware of Plaintiff's discrimination complaint, and that his complaint and subsequent termination were not "wholly unrelated," which may be inferred from "close temporal proximity." *See Gupta,* 212 F.3d at 590 (finding that the plaintiff's discrimination complaints in "late 1994" and January 1995 "arguably occurred within close temporal proximity" to adverse employment actions in Spring 1996 and "early 1997.")

Undisputed evidence establishes that Noble was aware of Plaintiff's discrimination complaints. As for the "wholly unrelated" element, Plaintiff filed his initial discrimination complaint in March 1998 and was terminated in July 1998. Given this close temporal proximity, *Gupta* compels the conclusion that the two were not "wholly unrelated," and, therefore, the requisite causal link established.

III(B)(2), *infra,* applies with equal force to Plaintiff's disparate treatment claim.

**13.** To the extent Plaintiff argues that Defendant's investigation itself constitutes an adverse employment action, (Doc. 37 at 131), that argument is rejected. The Eleventh Circuit defines "adverse employment actions" as "ultimate employment decision[s], such as discharge or failure to hire, or other conduct that alters the employee's compensation,

terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta,* 212 F.3d at 587. Completing a criminal background check on an employee (current or prospective) does not rise to such a level. To hold otherwise would discourage employer forethought and expose employer's to liability for negligent retention and hiring.

■ Plaintiff's prima facie case thus established, the burden shifts to Defendant to rebut the presumption of retaliation by producing a legitimate, non-discriminatory reason for Plaintiff's termination. Defendant asserts that Plaintiff's termination was "based upon criminal records obtained by [Defendant's] Security Department showing several criminal convictions, [Plaintiff's] admission that despite stating on his applications that he had no criminal convictions he had been convicted of at least one crime prior to submitting them, and [Defendant's] policy on falsified applications." (Doc. 30 at 10.) Defendant has satisfied its burden of production because this evidence is admissible (via Noble's testimony and documentary evidence) and sufficient to permit a jury rationally to conclude that Defendant did not retaliate against Plaintiff.

■ Defendant's burden thus satisfied, the burden shifts to Plaintiff to establish pretext. Plaintiff's evidence of pretext is limited to Eisenhardt's alleged statement that Plaintiff was under investigation for filing too many complaints. (Doc. 37 at 131–32.) The adverse employment action at issue, however, is Defendant's decision to terminate Plaintiff, not Defendant's decision to investigate Plaintiff. Regardless of why Defendant's investigation was launched, undisputed evidence establishes that it resulted in the discovery of Plaintiff's numerous criminal convictions and false employment application answers. Undisputed evidence also establishes that Defendant maintains a policy of terminating its employees for falsifying their employment applications.[14]

Plaintiff does not dispute the contents of the criminal history report Defendant relied upon in terminating Plaintiff, nor does Plaintiff dispute that his application answers were false. Plaintiff does not dispute Defendant's criminal background check policy, nor Defendant's policy of terminating employees for falsifying employment applications. And Plaintiff offers no evidence that Defendant failed to terminate a similarly situated, non-African American employee.

Instead, Plaintiff merely questions the wisdom of Defendant's decision because Plaintiff assumed that "industry norm" required him only to disclose his criminal convictions within the last five years. (Doc. 37 at 121.) Plaintiff's mistaken assumption is of no consequence; Defendant terminated Plaintiff for falsifying his employment application, not for unreasonably falsifying his employment application. And even if Defendant acted upon erroneous information, Title VII does not proscribe mistakes, just discrimination.

■ Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. Certainly Plaintiff's extensive criminal history, coupled with his failure to disclose such history, "might motivate a reasonable employer" to terminate Plaintiff from a management position with significant responsibilities. *Combs,* 106 F.3d at 1543. At most, Defendant's decision reflects sound business judgment and liability avoidance, not discrimination. Manifestly, Plaintiff offers insufficient evidence to permit a jury reasonably to conclude that Defendant's proffered reason is pretextual.

Even if Plaintiff had adduced sufficient evidence of pretext, however, summary judgment is nevertheless warranted under *Reeves* because the record conclusively reveals a nondiscriminatory reason for Defendant's decision—Plaintiff's false employment application answers. *Reeves,* 530 U.S. 133, 120 S.Ct. at 2109. Indeed,

---

**14.** Given that Defendant relies upon a specific company policy, or "work rule," to justify Plaintiff's termination, Plaintiff might have shown pretext by submitting evidence that (1) he did not violate the cited work rule, or (2) if he did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated. *Damon,* 196 F.3d at 1363 (citations omitted). Plaintiff offers no such evidence.

Plaintiff himself does not think that the Noble, also an African American, harbored any bias against Plaintiff because he filed a discrimination complaint. (Doc. 37 at 145.) Accordingly, Defendant's motion for summary judgment on Plaintiff's retaliation claim must be **GRANTED**.

### C. Hostile Work Environment

#### 1. Supervisor Conduct

 Plaintiff's evidence of supervisor harassment is limited to Bates' alleged statement in April 1997 regarding blacks and promotions. Adapting the prima facie elements set forth in *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir.1999) (*en banc*), Plaintiff must establish a prima facie case of hostile environment racial harassment by showing: (1) Plaintiff belongs to a protected group; (2) Plaintiff has been subjected to unwelcome harassment; (3) the harassment was based on Plaintiff's race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and to create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. 195 F.3d at 1245.

 Focusing on the fourth *Mendoza* element, four factors are relevant in determining whether conduct is sufficiently severe and pervasive from an objective standpoint to alter an employee's terms or conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with

the employee's job performance." *Id.* at 1246; *see also Gupta*, 212 F.3d at 584.

The Court finds that Bates' alleged statement was an isolated, offensive utterance that was not physically threatening in any way, and there is no evidence that it was so severe that it unreasonably interfered with Plaintiff's job performance. Accordingly, Plaintiff cannot establish a prima facie case of hostile work environment.[15]

#### 2. Co-worker Conduct

 Focusing on the fifth *Mendoza* element, "[e]mployer liability in a case involving [racial] harassment by a co-worker exists when the employer knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action." *See Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 & n. 3 (11th Cir.2000).

The evidence overwhelmingly demonstrates that Defendant took adequate remedial action to correct promptly the harassing behavior. To be sure, Defendant took remedial action by launching an extensive investigation into Plaintiff's complaints, interviewing fourteen (14) employees, meeting with Plaintiff during the investigation to ensure his fair treatment, and disciplining involved employees for inappropriate conduct.

Plaintiff does not suggest that Defendant's investigation or disciplinary actions were in any way inadequate. Thus the only reasonable conclusion supported by the evidence is that Defendant took prompt, corrective action in response to Plaintiff's complaints, and exercised reasonable care to prevent any further in-

---

15. Although Defendant does not raise the issue, Defendant may avail itself of the *Faragher* affirmative defense to defeat liability because no evidence suggests that Bates took any tangible employment actions against Plaintiff. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). "A tangible employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibili-

ties, or a decision causing a significant change in benefits." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 512 (11th Cir.2000). Although Bates transferred Plaintiff from Sports to Music, no evidence suggests that this transfer equated to a "reassignment with significantly different responsibilities." *Id.* Indeed, Plaintiff, like all managers, worked interchangeably at both resorts as needed. (Doc. 37 at 30.)

stances of harassment. Because Plaintiff cannot establish a prima facie case, Plaintiff's hostile environment claim must fail.

## IV. CONCLUSION

1) Defendant's motion for summary judgment (Doc. 30) is **GRANTED** on all claims;

2) Defendant's motion to strike Plaintiff's affidavit (Doc. 44) is **GRANTED**;[16] and

3) Plaintiff's motion to enlarge time (Doc. 46) is **DENIED**.

The Court **DIRECTS** the Clerk to close the case and enter judgment accordingly.

16. *See Hickman v. Taylor*, 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947) ("discovery, like all matters of procedure, has ultimate and necessary boundaries"); *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir.1989), *cert. denied*, 493 U.S. 863, 110 S.Ct. 180, 107 L.Ed.2d 135 (*pro se* litigants are "subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure"); *Hancock v. Hobbs*, 967 F.2d 462, 467–68 (11th Cir.1992). Even considering the subject affidavit, however, the final outcome of each claim is not affected.