**Thomas K. DOWNING, Plaintiff,**

v.

**UNITED PARCEL SERVICE, INC., Defendant.**

**No. 8:00–CV–1464–T–17F.**

United States District Court,
M.D. Florida,
Tampa Division.

July 23, 2002.

J. Robert McCormack, Persante & McCormack, P.A., Clearwater, FL, for Thomas K. Downing, plaintiff.

John E. Phillips, Jr., William F. Hamilton, Dennis McClelland, Holland & Knight, LLP, Tampa, FL, for United Parcel Service, Inc., defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KOVACHEVICH, Chief Judge.

This cause comes before the Court on the following motions and responses:

1. Defendant's Dispositive Motion for Summary Judgement. (Dkt. 11).

2. Plaintiff's Response to Defendant's Motion for Summary Judgment. (Dkt. 17).

3. Affidavit of Salvatore Palermo submitted by Plaintiff. (Dkt. 18)

4. Affidavit of Thomas Downing submitted by Plaintiff. (Dkt. 19).

5. Affidavit of Lori Downing submitted by Plaintiff. (Dkt. 20).

6. Affidavit of Aralyn Petterson submitted by Plaintiff. (Dkt. 21).

7. Affidavit of Tricia Dolan submitted by Plaintiff. (Dkt. 23).

8. Defendant's Motion to Strike Affidavits of Salvatore Palermo and Lori Downing. (Dkt. 24)

9. Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgement. (Dkt. 26).

5. Plaintiff's Response to Defendant's Motion to Strike. (Dkt. 28).

### FACTUAL AND PROCEDURAL HISTORY

The following facts are taken as true for the purposes of resolving the pending motions. The Plaintiff, Thomas Downing (Downing), is a resident of Clearwater, Florida. (Dkt. 1). Downing was born with a hearing loss and is considered to be deaf. (Depo. Downing 28:15–23). Downing communicates to others mainly through sign language, writing, and body language. (Depo. Downing 30:25 to 31:3). The Defendant, United Parcel Service(UPS), is a corporation who is licensed to do business in the state of Florida. (Dkt. 1).

In 1996, Downing began working for UPS as a part-time pre-loader for the Pinellas branch of UPS. (Dkt. 17). Downing was eventually promoted to several higher paying positions. (Dkt. 11). Downing's ultimate goal was to be promoted to the position of driver. (Dkt. 17). In March of 1998, Downing applied for a promotion as a part-time air exception driver. (Dkt. 17). Downing was told by UPS that he did not qualify for the position because he is deaf. (Dkt. 17). UPS requires an employee to first meet the requirements of the Department of Transportation (DOT) before he or she can fulfill the position of driver. (Decl. Rosentrater Ex. 2). One of these requirements is that an individual must not have a hearing loss greater than

40 dB. (Dkt. 11). In 1998, Downing filed a grievance with the Union. (Decl. Rosentrater ¶ 9). Also, in 1998 Downing began wearing hearing aids. (Decl. Rosentrater ¶ 10). In December of 1998, he was issued a DOT medical certification card from the Bayfront Walk-in Clinic (Bayfront), after he participated in a hearing test, authorizing Downing to drive as long as he was wearing his hearing aids. (Dkt. 17). In 1999, Downing applied and was chosen for a position as an air exception driver. (Dkt. 11). Through this series of events UPS and the Union were able to resolve Downing's grievance. (Decl. Rosentrater ¶ 10).

Once he was selected for the position of air exception driver, Downing was required to go through a training program. (Dkt. 11). The training program requires drivers to participate in classroom instruction, a road test, and safety training. (Dkt. 11). The training program was run by Dan Simmons (Simmons), the District Safety Manager. (Dkt. 11). The road test took place on March 3, 1999. (Dkt. 11). The parties do not agree about the events that took place during the road test. (Dkt. 11).

According to Simmons, Downing was driving for about 15–20 minutes when Simmons heard an ambulance approach the training car. (Decl. Simmons ¶ 8). The ambulance had its siren on. (Decl. Simmons ¶ 8). Simmons maintains that Downing never acknowledged the siren and that Simmons had to motion to Downing to pull over. (Decl. Simmons ¶ 8). Simmons says that he asked Downing about the siren and then let another trainee drive. (Decl. Simmons ¶ 8).

Downing, on the other hand, claims that there was never an ambulance. (Depo. Downing 71:8–9). Furthermore, Downing claims that Simmons never mentioned anything about an emergency vehicle trying to pass. (Depo. Downing 72:15–25). Down-

ing claims that when he was told to pull over it was for another trainee to drive. (Depo. Downing 72:7–10). He also claims that after the training session was over Simmons told Downing that he had done a good job. (Depo. Downing 72:3–6).

It was after this road test that Simmons approached Jennifer Bargen (Bargen), the Region Occupational Health Manager for UPS. (Decl. Simmons ¶ 10). Upon learning what Simmons claims happened during the road test, Bargen told Simmons not to allow Downing to drive until she had the chance to look into Downing's DOT card. (Decl. Simmons ¶ 10). Bargen contacted Bayfront, where Downing had received his DOT card. (Decl. Simmons ¶ 11). It was then Bargen learned that Bayfront administered the wrong test to Downing. (Decl. Rink ¶ 4). At Bayfront, Downing underwent a test that required him to use headphones. (Decl. Simmons ¶ 11). The test that Downing was supposed to take was a "free field" test. (Decl. Rink ¶ 4). This test is taken in a room with four walls and speakers and is known as an acoustic or sound room. (Decl. Rink ¶ 4). UPS then arranged for Downing to take another test at the Morton Plant Mease Hospital (Morton Plant). (Dkt. 11). At Morton Plant, Downing was administered the proper test by audiologists who were approved by UPS. (Dkt. 11). On March 25, 1999, Downing took this test and it was found that he did not meet the DOT requirement. (Decl. Rosentrater Ex. 4). On this date Downing's hearing loss was found to be at 43 dB. (Dkt. 17). However, the audiologist ordered another test because the result was close to the 40 dB requirement and because Downing seemed nervous during the test. (Decl. Rosentrater Ex. 4). On March 31, 1999, Downing returned to the Morton Plant. (Dkt. 17). During this test, Downing's hearing loss was found to be at 45 dB. (Dkt. 17). Downing asserts that the reason he did

poorly on these tests is because he was not provided with an interpreter. (Dkt. 17).

In March of 1999, Downing renewed his grievance with the Union against UPS. (Depo. Downing Ex. 6). On June 21, 1999, Downing went to the Friends of the Deaf Service Center, Inc. (Deaf Service Center) and was retested. (Dkt. 17). Downing was provided with an interpreter during this test. (Dkt. 17). At this test Downing's hearing loss was measured at 38 dB. (Dkt. 17). Using this test the audiologist from the Deaf Services Center found that Downing met the DOT standards. (Dkt. 17). This test result was submitted to UPS by the Union during the grievance process. (Decl. Rosentrater ¶ 13). However, because the audiologists from the Deaf Services Center were not approved by UPS and its medical department, UPS refused to consider the test. (Decl. Rosentrater ¶ 14). On September 2, 1999, Downing again went to Morton Plant for a third retesting. (Decl. Rosentrater ¶ 16). At this retest Downing failed to meet the requirements of the DOT. (Decl. Rosentrater ¶ 16). His hearing loss was found to be at 41.7 dB. (Decl. Rosentrater Ex. 8).

As part of the grievance process, Downing agreed to be tested yet again. (Dkt. 19). This time the testing would be conducted by an independent audiologist who both parties agreed on. (Dkt. 17). The list of audiologist were provided by UPS' expert witness. (Dkt. 17). Downing did not have the opportunity to provide audiologists to chose from. (Dkt. 17). Downing chose Tampa Hearing Services from the list. (Dkt. 17). However, Downing was unable to complete this test because his hearing aids were not working properly. (Depo. Downing 143:4–7). Downing was asked to reschedule the appointment. (Depo. Downing 143: 6–7). Downing rescheduled the appointment but never went. (Depo. Downing 159: 8–12).

On July 21, 2000, UPS sent a letter to Downing and the Union. (Decl. Rosentrater Ex. 11). In that letter, UPS notified the Union that Downing had not completed the terms of the settlement because he had failed to return to Tampa Hearing Services. (Decl. Rosentrater Ex. 11). The letter stated that it had been almost seven months since Downing was to be tested and that if there was no response from either Downing or the Union within five days then the matter would be closed. (Decl. Rosentrater Ex. 11). UPS claims that it never received a response from the Union or Downing. (Decl. Rosentrater ¶ 19).

On April 21, 1999, Downing filed a discrimination charge with the Equal Employment Opportunity Commission. (Depo. Downing Ex. 16). On April 19, 2000, Downing was issued his Notice of Right to Sue within 90 days. (Depo. Downing Ex. 24).

On July 19, 2000, Downing timely filed this complaint against UPS alleging that UPS violated the Florida Civil Rights Act (FCRA) and the American with Disabilities Act (ADA). In his complaint, Downing seeks to recover damages for lost wages, emotional distress, mental anguish, embarrassment, loss of income, and other related damages. Downing is also seeking injunctive relief and reinstatement to the position of air exception driver as well as enjoining UPS from further discrimination against him.

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c)(2000). However, the mov-

ing party bears the burden of initially proving that no issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265, (1986). In *Celotex,* the Court held that rule 56(e) requires the non-moving party to go beyond the pleadings in establishing whether there are specific facts showing a genuine issue to be resolved at trial. *Id.* A genuine issue exists where the record, taken as a whole, contains evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court has the responsibility to examine the evidence in the record and determine whether genuine issues exist for trial. Therefore, if the evidence is not probative and the non-moving party fails to show that a genuine issue exists, summary judgment should be granted. *Id.* In determining whether a genuine issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *Sweat v. Miller Brewing Co.,* 708 F.2d 655 (11th Cir.1983). Although factual disputes preclude summary judgment, the "mere possibility that factual disputes may exist, without more, is not sufficient to overcome a convincing presentation by the party seeking summary judgment." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980).

## DISCUSSION

The Defendant, in its motion for summary judgement, argues that the Plaintiff cannot prove the prima facie case required for a discrimination claim under the ADA and FCRA. It asserts that the Plaintiff failed to meet the prima facie case because the Plaintiff cannot prove that he is a "qualified individual" under the ADA or that UPS discriminated against him because of his disability. The Defendant also argues that its motion should be granted because the Plaintiff failed to request a reasonable accommodation from UPS.

The Plaintiff, on the other hand, argues that summary judgement should not be granted. He argues that there are serious questions of fact present. He asserts that he has set forth sufficient evidence to show that he is a "qualified individual" and that UPS discriminated against him because of his disability. Furthermore, the Plaintiff argues that the Defendant's argument that he failed to request a reasonable accommodation from UPS is not fatal to his claim as the Defendant asserts.

■ The ADA states that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a)(2000). To advance a claim under the ADA, Plaintiff must make a *prima facie* case establishing that: (1) he has a disability; (2) he is a "qualified individual," which is to say, able to perform the essential functions of the employment position he holds or seeks with or without reasonable accommodation; and, (3) the Defendant unlawfully discriminated against him because of the disability. *See Hilburn v. Murata Elecs. N. Am., Inc.,* 181 F.3d 1220, 1226 (11th Cir.1999). Each one of these elements will be discussed separately.

■ The Court also notes that the claims at issue here involve both the ADA and the FCRA. The Eleventh Circuit, in *Chanda v. Engelhard/ICC,* held that causes of actions under the FCRA are examined using the same framework as the ADA. 234 F.3d 1219, 1221 (11th Cir. 2000). Therefore, the Court will analyze

the Plaintiff's claims using the ADA guidelines.

### 1) *Disability*

■ Under the ADA, the term disability means: (a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (b) a record of such an impairment; or, (c) being regarded as having such impairment. *42 U.S.C.A. § 12101(2) (2000).* An individual is deemed to be "disabled" for purposes of the ADA if he satisfies any one of these three enumerated definitions. *See 29 C.F.R. Part 1630.2(g)(App.) (2000).* A physical impairment, standing alone, however, is not necessarily a disability as contemplated by the ADA. *See Pritchard v. Southern Company Services, 92 F.3d 1130, 1132 (11th Cir.1996).* The ADA requires that the impairment substantially limit one or more of the individual's major life activities. *See Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 725–26 (5th Cir. 1995).*

■ The Defendant does not attempt to argue that the Plaintiff fails to meet this element. There is no dispute between the parties as to whether or not the Plaintiff suffers from a disability. The Court finds that the Plaintiff's hearing loss does limit one or more major life activities such as talking, hearing, and communicating with others. Therefore, the Court finds that the Plaintiff has met this element of the prima facie case.

### 2) *"Qualified Individual"*

■ Having determined that the Plaintiff has met the first element of his prima facie case, the Court now turns to whether or not the Plaintiff is a "qualified individual." Determining whether an individual is "qualified" for a job is a two-step process. *See 29 C.F.R. Part 1630.2(m)(App.)(2000); see also Reed v. The Heil Company, 206 F.3d 1055, 1062 (11th Cir.2000).* The first step is to determine if Plaintiff satisfies the prerequisites for the position. This requires a court to take into account whether or not the Plaintiff has the necessary skills and experience, the required educational background, or the necessary licenses for the job. *Id.* In viewing the evidence in the light most favorable to the non-moving party, as required by *Wouters v. Martin County, Florida,* 9 F.3d 924, 929 (11th Cir.1993), this Court finds that a genuine issue of material fact exists as to whether the Plaintiff met the prerequisites for the position of air exception driver.

In its job description for the driver positions, the Defendant lists meeting the requirements of the DOT as a prerequisite. (Decl. Simmons ¶ 5, Ex. 1). This Court finds that there is a question of fact as to whether or not Downing meets the DOT hearing requirement. The Defendant argues that Downing has failed to meet the DOT hearing requirement and is not a "qualified individual." The DOT requires an individual's hearing loss to be 40dB or less. (Dkt. 11). UPS asserts that Downing failed three hearing tests given by Morton Plant, a company approved testing facility. (Dkt. 11). The first two tests took place in March of 1999. (Decl. Rosentrater ¶ 12, Ex. 4,5). At the first Morton Plant hearing test, Downing's hearing loss was measured at 43 dB. (Decl.Rosentrater, Ex. 4). However, a second hearing test was ordered because the audiologist noted that Downing's results were close to meeting the DOT requirement of 40 dB and that Downing appeared nervous during the test and repeatedly pushed the button that indicated he heard a tone even when there was not one. (Decl.Rosentrater, Ex. 4). At the second hearing test, Downing's hearing loss was measured at 45dB. (Decl.Rosentrater, Ex. 5). The audiologist found this test result reliable. (Decl.Rosentrater, Ex. 5). The third Morton Plant test took place in September of

1999 and showed that Downing's hearing loss was at 41.7 dB. (Decl. Rosentrater ¶ 16, Ex. 8).

However, there is also evidence of a test result from the Deaf Service Center. (Depo.Downing, Ex. 9). Downing took a hearing test with the Deaf Service Center on June 22, 1999. (Depo.Downing, Ex. 9). He took this test after he failed the first two Morton Plant hearing tests. (Aff Thomas Downing ¶ 8). The test results from the Deaf Service Center shows that Downing only suffers a hearing loss of 38dB. (Depo.Downing, Ex. 9). This result meets the DOT requirement of 40dB. (Depo.Downing, Ex. 9). Downing argues that this hearing test is correct because there was an interpreter present. (Aff. Thomas Downing ¶ 8). He argues that the test results from Morton Plant are invalid because an interpreter was not provided at those tests. (Dkt. 17). He argues that having an interpreter present at a hearing exam is to help the individual being tested to communicate with the audiologist. (Dkt. 17). He argues that the interpreter is able to sign to the individual what the audiologist is saying. (Dkt. 17). He asserts that having an interpreter present for communication between an individual and audiologist is more effective than writing. (Dkt. 17). This is because an individual who does not use spoken English has different writing abilities. (Dkt. 17). He argues that the Morton Plant tests were unreliable because there was no interpreter present at those exams. (Dkt. 17). As support for this claim, the Plaintiff points to the fact that during his hearing test, at the Deaf Services Center, there was an interpreter present. The Plaintiff passed that hearing exam. (Aff. Thomas Downing ¶ 8).

Based on the evidence presented the Court finds that there is a genuine issue of material fact as to whether Downing is a "qualified individual." There have been four hearing tests taken by the Plaintiff. Each one has reached a different result. At the Morton Plant tests, the testing facility chosen by the Defendant, Downing failed to meet the DOT requirement. At the Deaf Service Center, the testing facility chosen by the Plaintiff, Downing met the DOT requirement. Regardless of where the hearing test was administered, all of the test results have been within in close range to each other. In the hearing test from the Deaf Service Center the Plaintiff passed the DOT requirement. Two of the Morton Plant tests results are close to passing the DOT requirement. The Court finds that the fact that these test scores fall within close range of each other raises a question as to whether Downing meets the DOT hearing requirements. Furthermore, the Court finds that the Plaintiff's assertion that an interpreter should be present in order for the test results to be valid, along with the fact that there was no interpreter present for the Morton Plant hearing tests, also presents a question of fact as to which tests are accurate.

The second step is to determine whether Plaintiff can perform the essential functions of air exception driver, either with or without reasonable accommodations. The ADA provides that consideration shall be given to the employer's judgment as to what functions of a job are essential and the employer's written description for that job. See 42 U.S.C. § 12111(8). In viewing the evidence in the light most favorable to the non-moving party, this Court finds that a genuine issue of material fact exists as to whether or not the Plaintiff can perform the essential functions of air exception driver.

According to the Defendant's job description, one of the essential functions required by the air exception driver position is hearing. (Decl.Rosentrater, Ex. 2)

As the Court discussed above, a question of fact remains as to whether the Plaintiff can hear. Because of the conflicting hearing exams, there is still a genuine question of material fact as to whether the Plaintiff can hear within the DOT requirements. There also exists a question of fact as to whether the Plaintiff can perform the essential functions of the air exception driver position with a reasonable accommodation. The Plaintiff claims that the only reasonable accommodations available for him are hearing aids. (Def.'s Interrog. No. 3). However there is a question of fact as to whether or not these hearing aids, as an accommodation, will allow the Plaintiff to perform the essential functions of air exception driver. Each hearing test that Downing has taken has been administered while he was wearing his hearing aids. (Decl.Rosentrater, Ex. 4, 5, 6, 8). Each hearing test reached a different result as to Downing's hearing loss while he was wearing his hearing aids. Therefore, there is a question of fact as to whether or not Downing's reasonable accommodation of hearing aids will allow him to perform the essential function of the job.

Further evidence that there is a question of fact, as to whether Downing can perform the essential functions of air exception driver with use of his hearing aids, is the driving test that he took on March 3, 1999. The driving test was part of UPS's driver safety training program. (Decl. Simmons ¶¶ 7–8). Downing and other driver trainees were required to take this test in order to become UPS drivers. (Decl. Simmons ¶ 6). This test took place in a training car. (Decl. Simmons ¶ 8). In the training car that day were Downing, the other trainees, an interpreter for Downing, and Simmons, UPS's District Safety Manager. (Decl. Simmons ¶¶ 7–8). Downing was wearing both of his hearing aids during this driving test. (Depo. Downing 73:5–7). There is a conflict between the parties as to what exactly hap-

pened during the March 3rd driving test. The Defendant claims that during the driving test Downing failed to pull over for an emergency vehicle. (Decl. Simmons ¶ 8). Simmons claims that while Downing was driving an ambulance approached the rear of the training car with its siren on. (Decl. Simmons ¶ 8). Simmons says that Downing never reacted to the siren. (Decl. Simmons ¶ 8). He further claims that Downing only pulled over when Simmons motioned for him to. (Decl. Simmons ¶ 8). The three other students, all employees of UPS, support this story and claim that they heard a siren as well. (Decl. Oliver ¶ 4; Decl. Rietow ¶ 4; Decl. Rocca ¶ 4). Downing on the other hand claims that there was not a siren. (Depo. Downing 71:8–9). Furthermore, he alleges that he is able to hear sirens. (Depo. Downing 71:10–13). He also asserts that the reason Simmons had him pull over was to switch out drivers. (Depo. Downing 72:7–10). He claims that Simmons never mentioned an emergency vehicle or a siren. (Depo. Downing 72:15–23). To support his story Downing submits the affidavits of two interpreters who claim that they do not remember hearing or seeing an emergency vehicle during the driving test. (Aff. Dolan ¶¶ 5–6; Aff. Petterson ¶¶ 5–6). These affidavits further claim that Simmons never had Downing pull over because of an emergency vehicle. (Aff. Dolan ¶ 7; Aff. Petterson ¶ 7).

The Court finds that this incident presents a genuine issue of material fact regarding whether a reasonable accommodation would allow Downing to perform an essential function of the air exception driver position. There is a question as to what really occurred during the driving test on March 3rd. A reasonable fact finder would be in a better position to decide between the conflicting stories whether or not there was a siren on March 3rd. It will have the ability to evaluate the wit-

nesses' testimony and have the ability to decide which side is the most credible. If a fact finder were to find that there was a siren, then there is still a question of fact as to whether or not Downing can hear a siren using his hearing aids. That is, there is a question of whether or not the reasonable accommodation available to Downing would allow him to perform the essential functions of the job. Therefore, the Court finds that there is a genuine issue of material fact as to whether Downing is a "qualified individual" under the ADA.

### 3) Unlawful Discrimination

The Court will now discuss the last element of the Plaintiff's prima facie case. The Plaintiff must show that the Defendant discriminated against him by denying him the position of air exception driver. When determining whether a plaintiff was discriminated against based upon that plaintiff's alleged disability, the burden shifting analysis used in Title VII employment discrimination cases applies. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir.2000). The plaintiff bears the burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). After the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the burden shifts to the defendant, the defendant is required to show a "legitimate nondiscriminatory reason" for the alleged discriminatory action. *Id.* The defendant is only required to produce a nondiscriminatory reason for the alleged discriminatory actions. *Id.* Defendant is not required to bear the burden of proof. *Id.* Thus, the burden of production that shifts to the defendant, once a plaintiff has established its prima facie case of discrimination, is "exceedingly light" and easily established. *Perryman v. Johnson Products Co., Inc.*,

698 F.2d 1138, 1142 (11th Cir.1983). Once the defendant satisfies the burden of production, the plaintiff is required to prove by a preponderance of evidence that the defendant employer possessed a discriminatory intent, or that the defendant's alleged nondiscriminatory reason is a mere pretext for the adverse employment action. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. Summary judgment in favor of the defendant is appropriate if the plaintiff is unable to make a sufficient showing to rebut the defendant's proffered reasons for the employment decision. *Bogle v. Orange County Board of County Commissioners*, 162 F.3d 653, 658 (11th Cir.1998); *Beno v. United Telephone Co. of Florida*, 969 F.Supp. 723, 726 (M.D.Fla.1997).

▉ In this case, the Plaintiff states that the Defendant discriminated against him because of his disability. (Aff. Thomas Downing ¶ 11). To prove this, the Plaintiff again brings up the hearing tests and the fact that the Plaintiff was constantly retested by the Defendant, even when he submitted a hearing test that he passed. (Aff. Thomas Downing ¶¶ 7–11). There is also conflicting evidence as to what happened during the March 3rd driving test. There is inconsistent testimony as to whether or not there really was a siren during the driving test. (*See* Aff. Dolan ¶¶ 5–6; Aff. Petterson ¶¶ 5–6; Decl. Simmons ¶ 8; Decl. Rocca ¶ 4; Decl. Oliver ¶ 4; Decl. Rietow ¶ 4).

Based upon this, the Court finds that Downing has set forth enough evidence to show that there is a question of fact as to whether UPS discriminated against him. The fact that there is inconsistent testimony in the record as to what happened on March 3rd calls into question whether or not there was any motivation on the part of UPS and its Safety Manager, Simmons, to discriminate against Downing. This is further supported by the evidence that

Downing was constantly retested which resulted in conflicting test results.

■ The Court now turns to assessing whether the Defendant has stated at least one nondiscriminatory reason for disqualifying the Plaintiff to the position of air exception driver. The Defendant asserts that Downing was disqualified because he failed to meet the DOT hearing requirement for the position. (Dkt. 11). It cites as support for its decision 49 C.F.R. § 391.11, which prohibits an employer from allowing a person to drive a commercial vehicle if that person does not meet the necessary requirements. (Dkt. 11) It asserts that the Plaintiff has not met the necessary requirements because he has failed the three company approved hearing tests. (Dkt. 11). The Court finds that the Defendant has met its burden of proof by setting forth sufficient information to establish a nondiscriminatory reason for denying the Plaintiff the position of air exception driver.

Now that the Defendant has established a nondiscriminatory reason for disqualifying the Plaintiff, the Plaintiff must show some evidence that the Defendant's reason is a mere pretext. Reviewing the evidence found in the record, this Court finds that a question of fact emerges as to whether or not the Defendant's reason for not promoting the Defendant was a pretext. Again, this Court turns to the conflicting results from the hearing test. The Defendant relies on the three company approved test results for its reason for disqualifying the Plaintiff. However, the Plaintiff has asserted, and supported with evidence, that he passed a fourth hearing test. The first two company approved tests were taken in March of 1999. These two tests were taken at Morton Plant which was the facility chosen by UPS. The Plaintiff failed these two tests. The Plaintiff claims that he failed these tests because there was no interpreter present. Since an interpreter

was not present during these tests, the Plaintiff questioned the validity of the test results. (Aff. Thomas Downing ¶¶ 7–8). Because he questioned the results, he chose to be tested at Deaf Services Center in June of 1999. (Aff. Thomas Downing ¶ 8). This time the Plaintiff passed his hearing test and met the DOT requirements. (Depo. Downing Ex. 9). However, when presented with this evidence UPS refused to recognize this test result because its medical department did not approve of the Deaf Services Center. (Decl. Rosentrater ¶ 14). Furthermore, UPS questioned whether or not the Deaf Services Center administered an unbiased test, because it has been known to advocate for those who are deaf. (Decl. Rosentrater ¶ 14). In September of 1999, UPS sent Downing back to Morton Plant for a retest. (Decl. Rosentrater ¶ 16). Again, Downing failed to pass the hearing test. (Decl. Rosentrater ¶ 16). Downing filed a grievance with the Union. (Depo.Downing, Ex. 6). As a way to settle this grievance, Downing was to be tested by an independent audiologist. (Decl. Rosentrater ¶ 17). This audiologist was chosen through the following process. UPS compiled a list of company approved audiologists. (Decl. Rosentrater ¶ 18). This list was then submitted to Downing who chose one of the three names on the list. (Depo. Downing 141:12–19). Downing chose Tampa Hearing Services, which was located in Tampa, Florida. (Depo. Downing 142:22–24). Downing went to this exam, but he was not tested that day. (Aff. Downing ¶ 13). He claims that he was suspicious about the test because the audiologist appeared to be unsure about how to administer the hearing test. (Aff. Downing ¶¶ 12–13). Furthermore, Downing was having difficulty with his hearing aids during the exam. (Depo. Downing 142:25–143:1–7). Downing never returned to the retake the exam. (Depo. Downing

159: 8–12). He claims that he did not return because he felt that this constant retesting was UPS' way of discriminating against him. (Depo. Downing 160: 19–21).

The Court finds that the Plaintiff, has set forth disputed fact, regarding whether or not the Defendant's motives in disqualifying the Plaintiff were discriminatory. There is a question of the validity between the different hearing tests in how they were administered. This is supported by the fact that Plaintiff's results from the hearing tests varied within close range to each other. Also, there is a question of fact as to whether or not the audiologist at Tampa Hearing Services was administering the test in a proper manner.

The Court also turns to the March 3rd driving test. There is a serious question as to what events really occurred on March 3rd. UPS claims that an ambulance approached the training vehicle that day and that the Plaintiff failed to hear the siren and make way for the ambulance. (Decl. Simmons ¶ 8). It presents, in support of this assertion, the Declaration of four of its employees who were present during the training ride. (*See* Decl. Simmons ¶ 8; Decl. Oliver ¶ 4; Dec. Rocca ¶ 4; Decl. Rietow ¶ 4). Downing however claims that there was no siren and that he is capable of hearing a siren. (Depo. Downing 71:8–13). To support his claim, he presents his deposition as well as the affidavits of two interpreters who were present during the training ride. (*See* Depo. Downing 71:8–13; Aff. Petterson ¶¶ 5–6; Aff. Dolan ¶¶ 5–6). There is more than just a conflict of whether or not a siren was heard that day. There is also a conflict in the evidence as to whether or not Simmons told Downing about the siren when he had him pull over. This time UPS presents evidence from three of its employees that Simmons mentioned the siren when he had Downing pull over. (Decl. Simmons ¶ 8; Decl. Oliver ¶ 4; Decl.

Rietow ¶ 4). On the other hand, Downing claims in his deposition that he was told to pull over so that another trainee could drive. (Depo. Downing 72:7–10). In support of this claim, he submits the affidavits of the two interpreters who claim that Downing was not asked to pull over because of a siren. (Aff. Dolan ¶ 7; Aff. Petterson ¶ 7). Also, there is a question of what happened after the driving test. Downing claims that he asked Simmons how he did after the driving test and Simmons told him he did "wonderful." (Depo. Downing 72:3–6). However, Simmons claims that he approached Downing from behind after the exam and repeatedly called his name. (Decl. Simmons ¶ 9). He claims that he shouted at Downing using different octaves but that Downing never heard him. (Decl. Simmons ¶ 9). As a result of this driving test, Simmons reported Downing and UPS had Downing's hearing retested. (Decl. Simmons ¶¶ 10, 12). Both the hearing tests and driving test had an impact on UPS' decision to keep Downing from driving. Therefore, the Court finds that there is a substantial issue of fact as to whether UPS used the hearing tests as a pretext to discriminating against Downing.

■ The Defendant claims that the Court should not consider the March 3rd driving test. It argues that this driving test was merely the reason UPS began to investigate Downing's hearing. It argues that UPS did not use this driving test as a way to disqualify Downing for air exception driver. It claims that the reason he was disqualified from driving was because he failed to meet the DOT requirements.

The Defendant cites to *Chambers v. Walt Disney World Co.*, 132 F.Supp.2d 1356 (M.D.Fla.2001), for support. In *Chambers*, the plaintiff filed a complaint against the defendant claiming race discrimination and retaliation. *Id.* at 1363.

In order to prove his retaliation claim, the plaintiff presented evidence that a manager stated that the plaintiff was being investigated because he filed numerous complaints. *Id.* at 1369. However, it was while the defendant was investigating one of the plaintiff's complaints that it found the plaintiff had a criminal record. *Id.* at 1352. Investigating this further, the defendant found that the plaintiff had falsified his employment application to conceal his criminal background. *Id.* The defendant then fired the plaintiff. *Id.* In its reasoning, the court found that the evidence of the defendant's statement was insufficient to establish a pretext for retaliation. *Id.* at 1369. The court found that the defendant's statement went to the reason why the defendant began to investigate the plaintiff and not to the reason that the defendant fired the plaintiff. *Id.* It found that the plaintiff was fired because of his criminal record and that it did not matter how the investigation into his record came about. *Id.*

This case can be distinguished from the case at hand. In *Chambers*, the court found that the only evidence of a pretext the plaintiff offered was that the plaintiff was under investigation for filing numerous complaints. This court found that the evidence went only to the defendant's reason to investigate the plaintiff. It did not go to why the plaintiff was discharged. Here, a distinction can be made because the March 3rd driving test had a greater influence on the Defendant than just causing it to investigate the Plaintiff's ability to hear. The Court finds that the result of Downing's driving test had an impact on UPS's decision to disqualify Downing from the position of Air Exception Driver. (Dkt. 11). Looking in the record, the Court finds statements that support its observation that the driving test played a part in Downing being disqualified. The Court turns to the declaration of Thomas Rink, UPS's expert witness. Rink states

that he was contacted by UPS in July of 1999. (Decl. Rink ¶ 5). Rink was asked by UPS to evaluate Downing's March 1999 hearing tests from Morton Plant as well as Downing's hearing test from Deaf Service Center to determine if Downing met the DOT requirements. (Decl. Rink ¶ 5). In making his report to UPS, Rink stated that he found the hearing tests submitted by UPS showed that Downing did not meet the DOT requirements. (Decl. Rink Ex. 2). Rink went one step further and found that the March 3rd driving test illustrated that Downing was not qualified because he did not hear the alleged siren. (Decl. Rink Ex. 2). UPS relied on Rink's report in determining that Downing was not qualified for the position of air exception driver. (Decl. Rosentrater ¶ 15). Therefore, the Court finds that the March 3rd driving test was used by UPS for more than a reason to investigate the Plaintiff's hearing requirements. Instead, this Court finds that this driving test played a role in Downing actually being disqualified as a driver.

### Reasonable Accommodation

The last argument made by the Defendant is that Downing's discrimination claim cannot be upheld on the basis that UPS denied Downing a reasonable accommodation. It argues that Downing cannot use this argument because he never requested a reasonable accommodation from UPS. The Defendant cites *Gaston v. Bellingrath Gardens & Home, Inc.*, for support. 167 F.3d 1361, 1363–64 (11th Cir.1999).

In *Gaston*, the plaintiff resigned from her position when she found that she could not meet the requirements for the job. *Id.* at 1362. The defendant was under new management and this caused the guidelines for the plaintiff's job to change. *Id.* The plaintiff was told that she must fulfill these new guidelines or "else." *Id.* Upon

learning of these new guidelines, the plaintiff informed the defendant that she was unable to meet them. *Id.* A few weeks later the plaintiff resigned from her job. *Id.* She claimed that she resigned because she could not meet the new requirements; however, no evidence was presented to the court showing that she told the defendant why she resigned. *Id.* In her complaint, the plaintiff asserted that the defendant discriminated against her because it neglected to provide her with a reasonable accommodation. *Id.* The court granted summary judgement in favor of the defendant. *Id.* at 1364. The court reasoned that the plaintiff could not claim that her employer discriminated against her because it did not provide her with a reasonable accommodation for her disability. *Id.* Instead, the court found that a plaintiff must first request a reasonable accommodation from the employer and the employer must deny this accommodation. *Id.* Only then may a plaintiff assert that an employer discriminated against the plaintiff for neglecting to provide a reasonable accommodation. *Id.*

In the present case, the Court finds that the case law does not apply. The Plaintiff has not asserted that UPS discriminated against him because it failed to provide him with a reasonable accommodation. There is nothing present in the record to indicate that the Plaintiff ever requested a reasonable accommodation from UPS. In fact the Defendant points out that the Plaintiff admits, in his answer to the Defendant's interrogatory, that he did not ask UPS for a reasonable accommodation. (Dkt. 11). Therefore, the Court finds that this argument is not fatal to the Plaintiff's case.

### CONCLUSION

Therefore, in viewing the evidence in the light most favorable to the Plaintiff, this Court finds that an issue of genuine material fact exists as to whether or not Down-ing is a "qualified individual" and that UPS unlawfully discriminated against him. The Court notes that the Defendant also submitted a motion to strike the affidavits submitted by the Plaintiff in its response to summary judgement. The Court chooses not to discuss these affidavits because they have had no bearing on this Court's decision in denying summary judgement. Accordingly, it is

**ORDERED** that the Defendant's Dispositive Motion for Summary Judgment (Dkt. 11) and the Motion To Strike Affidavits of Salvatore Palermo and Lori Downing (Dkt. 24) be **DENIED**.